UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SEEMA V. NAMBIAR, M.D.,

                          Plaintiff

           -against-

THE CENTRAL ORTHOPEDIC GROUP, LLP,
DAVID ZITNER, MD., JORGE BAEZ, M.D.,
MITCHELL KESCHNER, M.D., JORDAN
KERKER, M.D., FERNANDO CHECO, M.D. and
SCOTT SILVERBERG, M.D.,

                        Defendants.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19-CV-938 (JS) (ARL)

**LINDSAY, Magistrate Judge:**

      The plaintiff, Seema V. Nambiar, M.D. ("Nambiar"), brings this action for age and sex

discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title

VII"), the New York State Human Rights Law ("NYSHRL"), Executive Law § 296 (1), (6), (7),

and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. (the "ADEA").  She has

also asserted a state cause of action for breach of contract.  Before the Court, on referral from

District Judge Seybert, is the defendants' motion for summary judgment pursuant to Federal

Rule of Civil Procedure ("Rule") 56, Nambiar's motion to strike exhibits and Nambiar's motion

for reconsideration of District Judge Brown's ruling granting the defendants' summary judgment

motion to dismiss Nambiar's retaliation claim.  For the reasons set forth below, the Court

respectfully recommends that the defendants' motion be granted and Nambiar's motions be

denied.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are

uncontested unless otherwise noted.

**A.    The Parties and Nonparties**

Nambiar is a board certified Physical Medicine and Rehabilitation physician.  Defs. Rule 56.1 Stmt. ¶ 9.  The defendant, The Central Orthopedic Group ("COG"), is a group of specialists and surgeons in general orthopedics, hand surgery, injections/aspirations, sports medicine, arthroscopic surgery, joint replacement, trauma fractures and pain management.  *Id.* ¶ 1; Pl. Rule 56.1 CounterStmt. ¶ 1.  COG's offices are located in Plainview, Rockville Centre, and Massapequa.  *Id.*  Nambiar worked in COG's Plainview office.  Defs. Rule 56.1 Stmt. ¶ 9.

The defendant, Scott Silverberg, M.D. ("Silverberg"), is a knee and shoulder surgeon and a managing partner of COG.  *Id.* ¶ 2.  As a managing partner, his responsibilities include, managing COG's day-to-day operations, salary increases and fielding complaints.  *Id.*  The defendant, Jordan Kerker, M.D. ("Kerker"), is a rotator cuff and anterior cruciate ligaments ("ACL") surgeon who joined COG as an employee and became a partner in 2013.  *Id.* ¶ 3.  The defendant, Fernando Checo, M.D. ("Checo"), is a spine surgeon who joined COG as an employee and became a partner in 2014.  *Id.* ¶ 4.  Checo was a referral source for Nambiar while she was an employee at COG.  *Id.*  The defendants allege that Checo was Nambiar's main referral source.  *Id.*  Nambiar alleges that Checo's referrals accounted for approximately 40% of her practice.  Pl. Rule 56.1 CounterStmt. ¶ 4.   The defendant, Jorge Baez, M.D. ("Baez"), is a high-risk joint replacement surgeon who joined COG as an employee and became a partner in 2003.  Defs. Rule 56.1 Stmt. ¶ 5.  The defendant, Mitchell Keschner, M.D. ("Keschner"), is a hand, wrist, and upper extremity surgeon who joined COG as an employee and became a partner in 2008.  *Id.* ¶ 6.

The defendant, David Zitner, M.D. ("Zitner"), is a founding member of COG.  *Id.* ¶ 7.

Zitner treats fractures, sprains, tendon, muscle, and joint injuries, as well as neck and back conditions. *Id.* When Nambiar began working part-time at COG, she shared an office with Zitner and observed that his practice was slowing down. Pl. Rule 56.1 CounterStmt. ¶ 7. Zitner chose to withdraw as a partner as of January 1, 2015, in order to start the beginning of his retirement, at which time he became an employee working part-time hours. Defs. Rule 56.1 Stmt. ¶ 7. All of COG's past and present partners (except the founding partners) joined as employees pursuant to employment agreements and became partners after a multi-year probationary period. *Id.* ¶ 8.

Nonparty Patricia Lettieri DeDomenico ("DeDomenico") worked at COG as its practice manager from May 2006 to December 5, 2019, and as its building manager from 2010 to December 5, 2019. *Id.* ¶ 11. In her role as practice manager, DeDomenico managed office policies, the hiring and firing of staff as well as staff and patient complaints. *Id.* DeDomenico left COG in December 2019 to work for Dr. Alexandre DeMoura at the New York Spine Institute in a managerial position. *Id.* Nonparty Dr. Yohan Lee ("Lee") is a pain management physician who replaced Nambiar after she was terminated. *Id.* ¶ 12.

Nonparty Michelle Cornacchio ("Cornacchio") was assigned to be Nambiar's first pain management supervisor at COG. *Id.* ¶ 48. In November 2015, Cornacchio was replaced by Nicole Carluccio ("Carluccio"), who had several years of experience in medical assistance and pain management. *Id.* Carluccio was responsible for, among other things, surgical bookings, running the fluoroscopy suite, scheduling procedures for patients and employees, patient escort, chart preparation, procedure room preparation and patient complaints. *Id.* Carluccio supervised the pain management department employees, Elaine Zurita ("Zurita"), Jodi Tarsitano, ("Tarsitano") Ava Zias ("Zias"), Jaime DeMartino ("DeMartino") and Ally Montesano

("Montesano"). *Id.* DeMartino worked as Nambiar's dedicated medical assistant. *Id.* Nambiar also interacted with Zurita and Montesano who worked at the pain management's front desk. *Id.* Finally, Nambiar worked with Jose Castaneda ("Casteneda"), an x-ray technician and C-arm operator. *Id.* ¶ 48. Specifically, he assisted Nambiar on Thursday and Friday procedure days. *Id.*

### B.     COG's Relevant Office Policies

COG maintained an Employee Handbook that set forth policies and standards of conduct, including prohibiting discrimination, harassment and retaliation in the workplace, which the defendants contend Nambiar was required to sign. *Id.* ¶¶ 14, 19. The Equal Employment Opportunity provision in the Handbook states:

> [COG] is an Equal Opportunity Employer that does not discriminate on the basis of actual or perceived race, creed, color, religion, alienage or national origin, ancestry, citizenship status, age, disability or handicap, sex, marital status, veteran status, sexual orientation, genetic information, arrest record, or any other characteristic protected by applicable federal, state or local laws.

Embry Decl. Ex. V (ECF No. 37)[1]. According to the Employee Handbook, COG also

---

[1] Nambiar has disputed a number of facts based on the lack of authentication. To be clear, she does not claim that the documents are not authentic but rather suggests that they have not been properly authenticated by, for example, a custodian affidavit. The undersigned finds that for the purposes of this motion, the documents, many of which are business records produced during discovery, have been sufficiently authenticated. *See Bhd. Mut. Ins. Co. v. Ludwigsen,* No. 16-CV-6369 (CS), 2018 WL 4211319, at *5 (S.D.N.Y. Sept. 4, 2018)("the Court 'has the discretion to consider unauthenticated or otherwise objectionable evidence where it is apparent that the party may be able to authenticate and establish the admissibility of those documents at trial.'"); *Kramsky v. Chetrit Grp., LLC,* No. 10-CV-2638, No. 11-CV-1735, 2011 WL 2326920, at *2 (S.D.N.Y. June 13, 2011) ("Where the Defendants would have the opportunity to authenticate these exhibits at trial, the Court will not strike them at this stage."). For the most part, there is nothing about the exhibits relied upon by the defendants to suggest that they would be unable to establish their authenticity at trial through one of the defendants, the plaintiff or a proper custodian. Indeed, many of the documents were utilized during the party and nonparty depositions and are business records or contemporaneous notes taken by COG employees.

Nambiar also seeks to strike many of the exhibits relied upon by the defendants, including most of the patient complaints and the deposition testimony of the defendants and nonparty COG employees, on the basis of hearsay. As will be discussed again in this report, COG has not offered recounts of the complaints received from its patients and staff for their truth, just for the fact that they were received by the practice and considered by the partners. Accordingly, the undersigned respectfully recommends that the motion to strike be denied. *See Poppito v Northwell Health, Inc., 15-CV-7431 (GRB), 2019 WL 3767504, *3 (E.D.N.Y. Aug. 9, 2019) ("the hearsay statements are offered not for the truth of the matter, but rather to provide insight into defendants' thought process in taking*

maintained a complaint procedure for reporting any incidents of alleged harassment or

discrimination.  *Id.*  Specifically, COG employees were allegedly advised:

> Any employees with questions or concerns about equal employment
> opportunities in the workplace are encouraged to bring these issues to the
> attention of your supervisor.  Note: If your Supervisor is the person toward
> whom the concern is directed, you should contact any higher level manager in
> your reporting chain. Employees may also contact TriNet's Employee Solution
> Center at (800) 638-0461 if they are uncomfortable for any reason using the
> above procedure. The Company will not allow any form of retaliation against
> individuals who raise issues of equal employment opportunity. To ensure our
> workplace is free of artificial barriers, violation of this policy will lead to
> discipline, up to and including discharge. All employees must cooperate with
> all investigations.[2]

*Id.*  Moreover, employees were encouraged to report any type of harassment or discrimination

whether targeted at the reporter or another individual in the workplace. Defs. Rule 56.1 Stmt. ¶

18.  Finally, COG partners were required to take a one-hour training course with an examination

on discrimination that was administered by TriNet.  *Id.* ¶ 20.  To be clear, Nambiar alleges that in

her time at COG, she never saw a copy of the Employment Handbook or any emails from

TriNet.  Pl. Rule 56.1 CounterStmt. ¶¶ 14, 19.

---

*disciplinary action against plaintiff"); McPherson v. New York City Dep't of Edu*c. 457 F.3d 211, 216 (2d Cir. 2006)
("[Plaintiff] is attacking the reliability of the evidence supporting [Defendant's] conclusions. In a discrimination
case, however, we are decidedly not interested in the truth of the allegations against [P]laintiff. We are interested in
what motivated the employer . . . .") (internal quotation marks omitted); *Kaur v. New York City Health and
Hospitals Corp.*, 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010)(handwritten notes of personnel decisions not hearsay
because not offered for the truth but "[r]ather, the documents are being offered to show the state of mind of
Defendant's representatives in making various employment decisions with regard to Plaintiff; the truth of the
assertions in the documents is irrelevant").

[2] TriNet administered certain HR functions for COG and also provided COG staff with their own Employee
Handbook prohibiting sexual harassment, discrimination, retaliation, provided resources for reported, and governed
workplace conduct.  Embry Decl. Ex. V; Defs. Rule 56.1 Stmt. ¶ 16.  Pursuant to the TriNet Employee Handbook,
"[i]f comfortable, employees [were] encouraged "to tell the harasser in clear language that the behaviors or
advances are unwelcome or unwanted and must stop."" If uncomfortable, employees [were] encouraged to make an
immediate report "to [their] manager, any other company manager or official, [their] TriNet HR Representative, or
the TriNet Employee Solution Center.  Defs. Rule 56.1 Stmt. ¶ 18.
.

### C.    Nambiar's Employment History Leading up to her Employment at COG

In 2006, a year after she was board certified in Physical Medicine and Rehabilitation, Nambiar began working at the Melville Surgery Center ("MSC"), which is a physician-owned practice. *Id.* ¶ 25.  Pursuant to the agreement she signed with MSC, Nambiar used MSC staff, equipment, and office space and provided MSC's patients pain management one day per week. *Id.*  At the time, several pain management doctors were operating out of MSC.  *Id.*

In 2007, Nambiar began performing interventional procedures at MSC one or two days per week. *Id.* ¶ 26.  The procedures included epidurals, facet blocks, SI joint injections and radiofrequency ablation.  *Id.*  Around the same time, COG's orthopedic surgeons and physicians were also performing some surgical procedures at MSC because Silverberg and Baez were part owners of MSC.  *Id.*

In September 2007, Nambiar executed a contract with Huntington Medical Group ("HMG"), a multidisciplinary practice with about 30 partners.  *Id.* ¶ 28.  Nambiar was HMG's first pain management doctor.  *Id.*  Pursuant to the HMG contract, Nambiar agreed to provide pain management services for a base salary of $60,000[3] plus 100% of her net earnings as long as she covered her expenses.  *Id.*  The contract also provided for the opportunity to buy-in as a voting shareholder ("full partner") on January 1, 2009.  *Id.*

On January 1, 2008, less than one year later, Nambiar began working full time at HMG. *Id.* ¶ 29.  The parties dispute whether Nambiar was a financial or a full partner at HMG in 2008. They do not however, dispute that Nambiar was working with Dr. Steven Wishner, a board certified doctor of internal medicine and a full partner at HMG.  *Id.* ¶ 30.  Nambiar also worked with three of HMG's orthopedists, Dr. Gurtowski, Dr. Spak and Dr. Choi.  *Id.* ¶ 31.  According

---

[3] Nambiar chooses to refer to this as a draw rather than a base salary.  Pl. Rule 56.1 CounterStmt. ¶ 38.

to Dr. Wishner, when Dr. Choi died in September 2011, Nambiar had trouble obtaining referrals and no one at HMG had a plan to increase her productivity.  *Id.*  It also appears that some patients had complained about Nambiar while she was at HMG, specifically about controlled substances, although it is unclear from the record if the complaints had anything to do with her lack of referrals.  *Id.* ¶ 32.  In fact, Nambiar claims that Doctor Raman Bhasin, President of HMG, shared with her a plan to increase her referrals.  Pl. Rule 56.1 CounterStmt. ¶ 31.

In any case, Silverberg, who had met Nambiar at MSC, claims that around that time he was advised by an anesthesiologist at HMG that Nambiar was looking to go elsewhere.  *Id.* ¶¶ 33, 34.  At that time, COG had two pain management physicians, Dr. Thampi and Dr. Finkelstein.  *Id.* ¶ 35.  But each physician only provided pain management services to COG patients one day per week.  *Id.*  Nambiar contends that by 2011 she was already a partner at HMG and was not interested in leaving that practice.   Pl. Rule 56.1 CounterStmt. ¶ 34.  But she did reach an agreement with COG in November 2011, whereby she would remain at HMG and also provide pain management services one day per week at COG's Plainview office as an independent contractor.  Defs. Rule 56.1 Stmt. ¶ 36.  The agreement she entered, entitled "Facilities Use Agreement," provided that Nambiar would pay COG $2,000 per month to use staff, equipment, office space to provide patients with pain management "one day [per] week" for the term of one year.  *Id; see also* Embry Decl. Ex. S.

In 2012, Nambiar claims she was again approached by Silverberg and this time was asked to join the practice as a partner.  Pl. Rule 56.1 CounterStmt. ¶ 37.  However, rather than joining COG and leaving HMG, Nambiar extended the Facilities Use Agreement for an additional year and agreed to pay COG $4,000 per month.  Defs. Rule 56.1 Stmt. ¶ 37.  The monthly fee was raised because Nambiar intended to increase her part-time frequency at COG to

two days per week.  *Id.*

Nambiar continued to work at HMG full-time while she was working at COG.  *Id.* ¶ 38.
However, in early November 2013, Nambiar executed an employment agreement with COG and,
on November 15, 2013, submitted notice to HMG that she was withdrawing her partnership
effective March 15, 2014.  *Id.* ¶ 41.  Dr. Wishner testified at his deposition that Nambiar never
indicated that she intended to leave HMG with him until she already had an offer from COG.  *Id.*
¶ 39.  He stated that she "wanted to make more money . . . . more money and more money and a
partnership opportunity." *Id.*  Nambiar says she decided to leave HMG for COG to perform high-
end procedures.  Pl. Rule 56.1 CounterStmt. ¶ 39.

Whatever her reasons were for changing practices, Nambiar formerly started to work at
COG on April 1, 2014 as a full time employee pursuant to the employment contract signed in
November.[4]  Defs. Rule 56.1 Stmt.  ¶ 9.  She was 41 years old at the time.  *Id.*  The employment
agreement she signed with COG was for a three year term.  Embry Decl. Ex. U.  According to
COG, it had a policy of using probationary periods to give COG an opportunity to observe a
physician employee's performance before making that employee a partner.  Defs. Rule 56.1
Stmt. ¶ 43.  Consistent with that policy, Nambiar's employment agreement provided that
"commencing on the 3rd anniversary date from [her] actual start date of [April 1, 2014] . . . and
provided [Nambiar was] not then in default under the terms of [the] Agreement and that [the]
Agreement [had] not been terminated prior to its expiration date, [Nambiar would] become an
equal member ("Partner") . . . in accordance with the terms of [the partner's] . . . Operating
Agreement dated October 1, 1998 . . . ." *Id.*  The employment agreement also stated that

---

[4] Nambiar notes that as soon as the Employment Agreement was executed in November 2013, she began spending time at COG almost every day to review and contribute to the design and construction of the pain management department, to formally train COG's medical and billing staff and to bring her pain management templates from her practice to customize them for COG. Pl. Rule 56.1 CounterStmt. ¶ 9.

Nambiar was required to perform reasonable duties relating to the practice of medicine and to comply with all reasonable requests and requirements of COG and any applicable third party payer programs. *Id.*

Finally, the employment agreement included a provision permitting either party to terminate it on ninety days written notice any time during the first or second year of the term and thereafter, only for cause. *Id.* The cause provision provided, in pertinent part:

> This Agreement shall terminate on discharge of Employee for good cause, as defined below. . ..
>
> iv. If Employee consistently fails or refuses to properly accept the execution of lawful orders and directives, consistent with Employee's job description set forth herein, of Employer's managing member;
>
> v. If Employee materially fails or refuses to perform or observe any term or provision of this Agreement to be performed or observed by Employee, Employee shall have three (3) business days to cure such defect, unless such failure or default has a material adverse impact upon Employer or Employer's dealings. . . .
>
> vii. If, in the sole discretion of Employer, Employee fails to perform her duties as set forth in this Agreement.

*Id.*[5]

From April 1, 2014 to March 31, 2015, Nambiar was paid both her base salary of $300,000 and a "bonus equal to 30% of gross collections . . . in excess of $600,000." *Id.* ¶ 46. From April 1, 2015 to March 31, 2016, Nambiar was paid both her base salary of $300,000 and a "bonus equal to 35% of gross collections in excess of $650,000." *Id.* ¶ 47. Nambiar claims she never received a bonus for 2015-16. Pl. Rule 56.1 CounterStmt. ¶ 47.

---

[5] The Employee Handbook, of which the defendants allege Nambiar was given a copy, sets forth an additional list of unacceptable workplace conduct included violations of safety rules and policies, failure to follow lawful instruction of a supervisor, violation of the solicitation policy, unsatisfactory job performance, having personal guests visit or accompany them in COG facilities. Defs. Rule 56.1 Stmt. ¶ 42; Embry Decl. Ex. V.

### D.      Complaints About Nambiar

As stated above, Nambiar began working as a full-time employee at COG on April 1, 2014.  Defs. Rule 56.1 Stmt. ¶ 52.  According to DeDomenico, COG's practice manager, by the fall of 2014, COG started getting a lot of complaints from staff and from patients about Nambiar.  Embry Decl. Ex. Q 174:15-18.  At her deposition, DeDomenico recalled that by December 2014, around the time of the practice's holiday party, "things started to get bad with [Nambiar]."  *Id*. at 82:13-22; 83:6-14.  To this end, she testified:

> Q:  . . . When do you first recall discussing with [Nambiar] issues about her treatment of staff or patients?
>
> A:  I think they really started . . . at the end of the first year towards . . . the fall. . . .  What I do remember is that the holiday party, . . . things started to get bad with her.  People were starting to complain.  Patients were starting to complain. . . . It started to get progressively worse after that. . ..
>
> Q:  Do you recall anything at the holiday party in 2014 related to [Nambiar's] treatment of patients or staff?
>
> $*$              $*$              $*$
>
> A:  . . . [T]he holiday party that she came to, we were all getting along, but there were certain staff members like [Cornacchio] and [DeMartino] who wouldn't go near her.  Things were getting a little rocky then.

*Id.*  In fact, the defendants allege that they were already receiving complaints from staff about Nambiar by the summer of 2014.  For example, DeDomenico testified that, in July 2014, DeMartino came to her crying and complaining that Nambiar had thrown Betadine against a wall in a treatment room and demanded that DeMartino fetch it out of a sharps container in which it had landed.  *Id*. at 83:19-84:16.  She said the other staff always said Nambiar "was just very up and down, hot and cold out of nowhere."  *Id*. at 84:19-22.

DeDomenico further testified that "[i]t started to get progressively worse after [the

December 2014 holiday party]." *Id.*   For example, on April 27, 2015, DeMartino filed another

complaint, which stated:

> Inter office pt came in today.
>
> When [Nambiar] was finished with the patient they came out of the room. [Nambiar] asked where the w/c papers for the patient were.  I asked which papers.  She stated the w/c papers you forgot.  I showed her w/c papers asking if those were them.  She said yes go back in the room with the pt & fill them out.  I took the pt in the room & and he then said to me [Nambiar] is rude & disgusting in the way she was just talking to me & himself.  He said he may never come back if she continues to talk to me in that way.  He told me its okay she's just a rude unhappy person that I didn't do anything wrong and should not be spoken to like that.  I told the pt thank you its okay and he said its not she is rude to her new pt and staff.

Embry Decl. Ex. X.  Nambiar asserts that she does not recall the patient described in the April

2015 note.  Pl. Rule 56.1 CounterStmt. ¶ 54.  She further argues that by the summer of 2015, it

was she who had to repeatedly complain about DeMartino's poor attitude and insubordination.

*Id.* ¶ 48.

Nonetheless, on July 9, 2015, DeMartino also reported the incident with the Betadine

described above.  Defs. Rule 56.1 Stmt. ¶ 56.  Nambiar denies that the Betadine incident

occurred in the way it was described.  She says that a Betadine swab had spilled on the wall and

she asked DeMartino to clean it, which made her upset.  Pl. Rule 56.1CounterStmt. ¶ 56.  After

the July incident, DeMartino was moved out of the pain management department and up to the

orthopedic floor.  *Id.* ¶ 56.

Similarly, in July 2015, Cornacchio, who suffers from multiple sclerosis, also reported

that Nambiar had treated her horribly.  Defs. Rule 56.1 Stmt. ¶ 57.  Specifically, Cornacchio

reported that Nambiar didn't want her in the pain management department and intentionally kept

the pain management suite at extreme temperatures to aggravate her medical condition.  *Id.* ¶ 58.

Nambiar denies this fact and contends that she kept the pain management department around 72°

F since pain management patients generally did not like the cold, and often had to partially disrobe to receive injections and undergo procedures. Pl. Rule 56.1 CounterStmt. ¶ 58. At any rate, after complaining about Nambiar, Cornacchio quit COG and took a job elsewhere. Defs. Rule 56.1 Stmt. ¶ 58.

On August 19, 2015, a patient then submitted an online patient complaint indicating that Nambiar had a poor bedside manner and provided the patient with the wrong information. Defs. Rule 56.1 Stmt. ¶ 59. Nambiar does not deny that the online complaint was made. But she says that no one discussed online complaints with her and notes that Baez had stated at his deposition that Nambiar's online reviews did not have anything to do with COG's later decision to take her off the partnership track. Embry Decl. G 150:13–151:6.

At any rate, the defendants allege that on or about September 25, 2015, Nambiar then threw a needle at the sharps bin in an examination room and it hit, and stuck in, the back of the leg of her new medical assistant, Carluccio. Defs. Rule 56.1 Stmt. ¶ 60. Casteneda, the x-ray technician, was present during the occurrence and recalls observing Nambiar throw the needle two or three feet. *Id.* Carluccio reported the incident to DeDomenico. *Id.* ¶ 60. Nambiar does not deny the incident occurred but says that it was an accident. Rule 56.1 Stmt. ¶ 60. Nevertheless, the needle had to be removed and Carluccio was required to get blood tests for Hepatitis C and HIV. *Id.*

On November 1, 2015, another patient filed an online complaint stating that Nambiar showed no interest in them and had "extremely poor doctor skills." Specifically, the complaint stated:

> She showed no interest at all in me or my condition. Stopped going to her, seems more concerned with her personal appearance than the welfare of her patients, first time I ever changed doctors. Extremely poor doctor patient skills.

12

Embry Decl. Ex. VV.  Shortly thereafter, on December 11, 2015, a different patient complained that she had arrived at COG in pain and Nambiar changed her appointment without notice.  The patient was advised that Nambiar had moved the appointment so that she would have her afternoon off.  Defs. Rule 56.1 Stmt. ¶ 63.  Nambiar contends that December 11 was a procedure day for her, which could explain why she was unable to see a patient without notice, and she has no recollection of any scheduling issue with that patient.  Pl. Rule 56.1 CounterStmt. ¶ 63.

On December 30, 2015, Zias complained that Nambiar had yelled at her in front of other staff concerning Botox orders.  Defs. Rule 56.1 Stmt. ¶ 65.  Nambiar says it was she who complained about Zias' inability to correctly complete the authorizations for Botox, which prevented some patients from getting their treatment.  Pl. Rule 56.1 CounterStmt. ¶ 65. Nevertheless, that day, DeDomenico spoke to Nambiar about "her treatment of employees in front of staff and patients," specifically concerning Zias, Carluccio and Natalie Madrid, who worked on the second floor in orthopedics.  Defs. Rule 56.1 Stmt. ¶ 66.  Nambiar was given a Record of Verbal Warning that identified both her insubordination and abruptness with employees.  Embry Decl. Ex. FF.

Between January 6 and 14, 2016, three of Checo's patients then complained to him about Nambiar's behavior.  Defs. Rule 56.1 Stmt. ¶ 68.  Checo claims he then received unsolicited complaints from an additional five patients during that time period.  *Id.* ¶ 69.  The complaints included that Nambiar "was condescending," "was not attentive and rushed," and "didn't care." *Id.*  Nambiar acknowledges that Checo approached her about complaints but does not recall receiving complaints from the patients mentioned by the defendants.  Pl. Rule 56.1 CounterStmt. ¶ 69.  She also claims that a lot of the complaints involved medication dosages and her requirement for drug screens.  *Id.*

13

The defendants contend that due to complaints like the ones set forth above, by 2016, COG was having to refer patients to pain doctors outside of the practice.  Defs. Rule 56.1 Stmt. ¶ 70.  In fact, Checo testified at his deposition that by the end of 2015, a lot of his patients refused to discuss their experience with Nambiar and simply asked to be sent somewhere else.  Embry Decl. Ex. K 13:7–14:6.  In a similar vein, Silverberg testified that he was getting complaints on a regular basis from patients and staff about Nambiar.  Defs. Rule 56.1 Stmt. ¶ 71.  DeDomenico testified that she received many complaints about Nambiar before she even started documenting them or having staff document them.  *Id.* ¶ 72.  Nambiar disputes all of these facts.  To begin with, she says that patients were being referred to other practices because COG lacked the equipment to perform procedures like implantation of spinal cord stimulators.  Pl. Rule 56.1 CounterStmt. ¶ 70.  She also says it was not until January 2016 that she first heard that patients were complaining about her.  *Id.* ¶ 71.

Whether or not it was the first time she heard that patients were complaining about her conduct, Nambiar's recollection that she learned of the complaints in January 2016 is consistent with the defendants' contention that a series of meetings took place that month to address her behavior.  Specifically, the defendants claim that at the COG's partner's meeting on January 12, 2016, it was noted that "there were multiple complaints about [] Nambiar regarding her treatment . . . [of] staff and patients," "several instances" of her "refusal to see patients who had shown up at their appointment times," and "multiple patients request[ing] to see another pain doctor due to [her] attitude." Embry Decl. Ex. JJ.[6]  Two days later, Silverberg met with Nambiar.  Defs. Rule 56.1 Stmt. ¶ 77.  He claims to have "warned" her that her conduct could not continue.  *Id.*  He

---

[6] Nambiar objects to the use of the statements contained in JJ on the basis of hearsay.  The Court takes this opportunity to note, once again, that the statements were not offered for the truth of the matter but rather to show the effect on the listeners.

also recalls having advised her that COG had made multiple staff changes to accommodate her and had already discussed her attitudes towards patients many times. *Id.* Nambiar does not deny that the meeting with Silverberg occurred but she suggests that Silverberg only mentioned prescribing pain medication to placate patients because the practice relied on referrals and it was important to "give the patients what they want." Pl. Rule 56.1 CounterStmt. ¶ 77.

### E. The Proposed Amended Employment Agreement and the Events Following Nambiar's Decision Not to Sign

Although Nambiar claims that certain pain management patients had returned to COG following the meeting with Silverberg, the defendants contend that Nambiar's efforts to improve her conduct were insufficient. Defs. Rule 56.1 Stmt. ¶ 79. As a result, COG exercised the clause in Nambiar's contract that allegedly allowed them to terminate her existing employment contract without cause. *Id.* ¶ 79. Specifically, Silverberg testified, at his deposition, that because of her conduct, COG was not at a point where they wanted to guarantee her a partnership but "they were still hoping one day she could be a partner." Embry Decl. Ex. J at 26:4-8.

Accordingly, rather than firing her outright, on January 28, 2016, COG presented Nambiar with a "First Restated Employment Agreement" during a meeting in which Silverberg, Baez, Kerker, and Checo were in attendance. Defs. Rule 56.1 Stmt. ¶ 81. The new contract had no provision for partnership and only a one-year term of employment. Pl. Rule 56.1 CounterStmt. ¶ 81. However, the compensation under the new contract was generally the same as it would have been under her original employment contract - a base salary of $300,000 and "bonus equal to 40% of gross collections. . . in excess of $700,000." Defs. Rule 56.1 Stmt. ¶ 83. Nambiar notes that the new agreement had a higher collection target and was missing certain other benefits. Pl. Rule 56.1 CounterStmt. ¶ 83. The proposed agreement also added a provision requiring Nambiar to take call. Pl. Rule 56.1 CounterStmt. ¶ 84. Following the meeting,

Nambiar told DeDomenico that she had been handed a new contract and "was very upset . . . [and] emotional." *Id.* ¶ 82.  Indeed, on the advice of counsel, Nambiar refused to sign the proposed agreement because it was for a one-year term, no longer had a path to partnership and had restructured the bonus formula.  Defs. Rule 56.1 Stmt. ¶ 84; Pl. Rule 56.1 CounterStmt. ¶ 84.

In February, with Nambiar's new contract in limbo, Carluccio reported to DeDomenico that she was having difficulty interacting with Nambiar.  According to the defendants, Carluccio reported that Nambiar would adjust her schedule without discussing it with her pain management supervisor, ask Carluccio to complete tasks when she was occupied and then grow impatient and undermine Carluccio's authority as the pain management supervisor when Carluccio would address the staff.  *Id.*  Nambiar acknowledges that the complaint was made but argues that Carluccio was trying to take over the pain management practice and impose the practices and procedures that had been done at her former workplace.  Pl. Rule 56.1 CounterStmt. ¶ 87. Nambiar also contends that she had to frequently remind Carluccio that the role of the pain management supervisor at COG was subordinate to Nambiar's authority as the pain management physician.  *Id.*

Nonetheless, COG claims that it also continued to receive complaints about changes that Nambiar would make to the schedule.  To this end, DeDomenico testified at her deposition that Nambiar would often adjust her appointments to have an early lunch, late lunch, or to leave work early for the day, which would involve cancelling patient appointments.  Defs. Rule 56.1 Stmt. ¶ 88.  DeDomenico further testified that she had spoken to Nambiar about "cancelling [appointments] for patients that really needed to be seen" and discouraged her from cancelling appointments "last minute and leav[ing] when she want[ed]." *Id.*  Nambiar denies this fact.  She contends that she did not adjust her schedule, but rather was given the same schedule every

week.  Pl. Rule 56.1 CounterStmt. ¶ 87.  In fact, Nambiar asserts that it was Carluccio who cause the scheduling problems because she often needed to attend to her child or deal with an ongoing custody dispute with the child's father.  *Id.*

Still, in February 2016, DeDomenico also received a complaint about Nambiar throwing papers at Elaine Zurita.  Defs. Rule 56.1 Stmt. ¶ 90.  Carluccio also testified at her deposition that Nambiar criticized Zurita's Spanish skin tone and indicated that she should lighten it.  *Id.* Again, Nambiar disputes these facts.  She says that she never threw papers at any staff, though occasionally papers simply fell off the narrow ledge at the reception counter in the pain management department.  Pl. Rule 56.1 CounterStmt. ¶ 90.  She also vehemently denies ever saying anything about Zurita's skin color.  *Id.*

On February 25, 2016, with the new agreement still unsigned, Silverberg and Baez met with Nambiar again to discuss her future with COG.  Defs. Rule 56.1 Stmt. ¶ 91.  Silverberg had suggested earlier in the day that Nambiar's husband attend the meeting, which he did.  Pl. Rule 56.1 CounterStmt. ¶ 91.  During the meeting, Silverberg advised Nambiar and her husband that the partners had already voted not to give her a path to partnership, saying that they did not want to be "married" to her.  *Id.*  In fact, Nambiar recalls Silverberg stating that a partnership was "off the table completely."  *Id.*  Nambiar also claims that Silverberg stated that the reason for the decision was financial because the partners did not want to share their revenues with a pain management physician and did not believe that she would collect over $1 million, which would have entitled her to share in the other partners' revenues.  *Id.*  Silverberg recalls that Nambiar's husband responded that she would never sign the new contract.  Defs. Rule 56.1 Stmt. ¶ 95.

In March, Checo, Silverberg, DeDomenico and Nambiar met again to discuss her employment.  *Id*. ¶ 92.  Checo presented Nambiar with a further revised alternative employment

agreement and advised that she would have to sign it in order to continue her relationship with COG.[7]  *Id.*  During the meeting, Silverberg claimed that COG was receiving more complaints from patients and staff, and that this new proposed agreement therefore had a detailed behavior clause.  Pl. Rule 56.1 CounterStmt. ¶ 92.  Around the same time, on March 12, COG cancelled the cosmetic Botox clinic unsure of whether Nambiar intended to remain at COG.  Defs. Rule 56.1 Stmt. ¶ 99.

COG also continued to receive complaints about Nambiar during that time period.  For example, on March 10, 2016, a patient's wife called COG to explain that her husband had a horrible experience with Nambiar.  *Id.* ¶ 100.  She stated that Nambiar had only consulted with her husband for two minutes, failed to explain the procedure, and did not seem interested in treating her husband's pain.  *Id.*  The caller further stated that "she ha[d] multiple friends . . .[tell] her that [Nambiar] doesn't care for her patients nor give time with them." *Id.*  Four days later, Nambiar injected a patient in his hip using an injection site covered in a rash and he later required hospitalization.  When DeDomenico followed-up with the patient, the patient asked that the incident be documented.  *Id.* ¶ 113.  On March 20, 2016, Zurita then reported to DeDomenico that a patient called COG and stated that he would not return to COG because Nambiar was "quick, nasty, and not compassionate." *Id.*

### F.     Search for a New Pain Management Doctor

In early March, COG began looking for a new pain management physician.  *Id.* ¶ 97.  Specifically, Kerker and DeDomenico contacted an advertising person and inquired about placing an ad for a pain management doctor.  *Id.* ¶ 96.  COG then submitted information for the online job advertisement.  *Id.* ¶ 97.  The advertisement referenced, among other things, COG's

---

[7] The parties dispute whether there was a deadline set for executing the new agreement.

interest in a fellowship-trained interventional pain management doctor. *Id.* The advertisement, drafted by Kerker, closed with the following statement: "We need someone eager, young, and looking to work hard. This opportunity to have a busy practice from day one is unique and very appealing." *Id.* ¶ 137. Kerker testified that it was not COG's intention to find someone young in age. Embry Ex. H 73:25-74:13. He claims it was a poor choice of words. *Id.* He says he only intended to indicate that the practice wanted a doctor coming right out of fellowship, regardless of their actual age, to grow with the practice. *Id.* On March 15, 2016, Silverberg advised Nambiar that COG had advertised for her replacement and had received resumes from "four very qualified physicians." *Id.* ¶ 105. Nambiar contends that Silverberg mentioned that they were "young." Pl. Rule 56.1 CounterStmt. ¶ 103.

### G.   Nambiar's Termination and the Complaints that Followed

On March 21, 2016, Nambiar was given a termination letter with a ninety day notice period. Defs. Rule 56.1 Stmt. ¶ 114. Nambiar does not dispute receiving the letter but argues that by the time she received it, she was already in her third year of practice, and thus, could only be terminated for cause. Pl. Rule 56.1 CounterStmt. ¶ 114. Specifically, Nambiar asserts that the contract commenced on the date it was signed on November 7, 2013, not on April 1, 2014, the day she began working full time. Embry Decl. Ex. BBB. She makes this assertion notwithstanding the fact that the employment agreement includes a line for an effective start date that appears to be different than the execution date. *Id.* Ex. U. However, for some unexplained reason, the parties left the effective date blank in the contract. *Id.* Nonetheless, Nambiar does acknowledge that she was working full time at HMG until mid-March of 2014. *Id.* Ex. F. 40:24-41:17. In fact, the notice she provided to HMG in November, shortly after executing the agreement, makes clear that she was going to continue as a partner of HMG until mid-March,

19

three months after the time Nambiar now claims her COG contract became effective. *Id*. Ex. T.

In any case, on March 23, 2016, two days after COG had given Nambiar the termination letter, COG received a complaint that a new patient arrived with his wife and son, there was a language barrier, and Nambiar allegedly laughed at the wife when she asked if there was any preparation necessary for an MRI, which caused the wife to become upset and cry. Defs. Rule 56.1 Stmt. ¶ 116. The following day, on March 24, 2016, it was reported that Nambiar canceled an appointment for a patient in pain because the patient could not change his appointment to fit her schedule. *Id.* ¶ 117. On March 29, 2016, it was also reported that Nambiar refused to see a patient who had several facial reconstructive surgeries and had run out of his five-day supply of pain medication. *Id.* ¶ 118. Apparently, that patient had missed his appointment and Nambiar refused to see him because "he was late." On March 31, 2016, a longtime patient of Zitner then complained that Nambiar was "so rude and insensitive, she shouldn't be a doctor." *Id.* ¶ 121. Nambiar does not recall any of these incidents. Pl. Rule 56.1 CounterStmt. ¶¶ 116-8, 21.

On March 31, 2016, Nambiar directed her attorney to demand that COG reinstate her employment. Defs. Rule 56.1 Stmt. ¶ 122. COG contends that after receiving her attorneys' letter it had received a few additional complaints and Nambiar was given a verbal warning for insubordination and substandard work performance. *Id.* ¶ 127. COG claims that it also received a report that Nambiar was disparaging COG's partners, which she denies having done. *Id.* ¶ 128. Nevertheless, based on the continued patient complaints and their belief that Nambiar was disparaging them, COG terminated Nambiar's employment immediately effective April 8, 2016. *Id.* ¶ 129. Nambiar acknowledges that the defendants did not have a replacement for her until after she had been directed to leave permanently. Pl. Rule 56.1 CounterStmt. ¶ 129.

As such, April 8, 2016 was Nambiar's last day at COG. Defs. Rule 56.1 Stmt. ¶ 130.

COG asserts that it still compensated Nambiar for the 90-day period following her initial termination notice with a $59,611.55 check.  *Id.*  Nambiar claims that she only received her regular salary through June 21, 2016, not through June 30, 2016, and thus, was short a pretax sum of $8,076.92.  Pl. Rule 56.1 CounterStmt. ¶ 130.  Nambiar also contends that no expense compensation was provided to her and she was due an additional $2,750 in expenses.  *Id.*  She further states that her compensation should have included accrued, but unused, vacation of 2 weeks, and thus, she was owed an additional pretax $12,500.  *Id.*  Lastly, Nambiar claims that COG was required to pay for her health benefits and that she was entitled for compensation for the malpractice insurance she was required to maintain for thirty days.  *Id.*

### H.    Drs. Lee, Goldstein and Mathen

As mentioned above, on March 7, 2016, COG began advertising for a pain management doctor to replace Nambiar.  COG ultimately hired Lee, a fellowship trained pain management physician, to replace Nambiar.[8]  Defs. Rule 56.1 Stmt. ¶ 131.  Lee was 37 at the time.  *Id.* ¶ 12.  He began working at COG in July 2016.  *Id*.  Prior to joining the practice, Lee signed an employment agreement providing for a salary and bonus structure based on collections.  Embry Decl. Ex. L 21:8- 23:9.  The term of the agreement was for four years and had not been renewed at the time of his deposition in this case.  *Id.* 23:10-24:5.  Lee's employment agreement had no provision for a potential partnership.  *Id.* 36:23-25.

One year earlier, while Nambiar was still employed at COG, COG also hired Dr. Santosh Mathen ("Mathen").  Unlike Nambiar, Mathen was given a 4-year employment contract with a

---

[8] Lee first applied to COG in 2013 at the age of 34. He was rejected because COG partners believed that his fellowship experience was insufficient.  Defs. Rule 56.1 Stmt. ¶ 12.  Lee was not board certified on his start date but obtained the board certification a few months after joining COG.  Pl. Rule 56.1 CounterStmt. ¶ 138.

possibility of partnership at the end of the four year term.  Defs. Rule 56.1 Stmt. ¶ 154.[9]

According to the defendants, like Nambiar, they had received complaints about Mathen's

conduct and chose to exercise their right to change the partnership track during his probationary

period.  *Id.*  However, Mathen agreed to work for a year without a potential for partnership,

allegedly "cleaned up his act" and was put back on the partnership track in January 2018.  *Id.*

In July 2016, COG also hired a 62-year-old orthopedic surgeon, Dr. Mitchell Goldstein

("Goldstein").  Defs. Rule 56.1 Stmt. ¶ 141.  COG terminated Goldstein in the summer of 2018

due to practice and staff complaints.  *Id.*

## I.      Notice of the Alleged Discriminatory Conduct

Nambiar alleges that, on March 16, 2016, she orally informed DeDomenico that she had

"drafted a letter with [her] attorney and was filing a complaint letter with the EEOC" because the

defendants were harassing her.  Defs. Rule 56.1 Stmt. ¶ 106; Pl. Rule 56.1 CounterStmt. ¶ 106.

DeDomenico claims that the conversation never took place.  *Id.*  She says she first learned of the

EEOC complaint when the EEOC contacted her months after Nambiar had left the practice*.  Id.*

Still, Nambiar asserts that she filed a complaint with the EEOC on March 17, 2016, four days

before she was given the ninety-day notice, because COG's partners were bullying her to sign a

new employment agreement, they had cancelled her Botox order, they placed a staffer in her

office and they had directed her to no longer speak to the billing staff.[10]  Defs. Rule 56.1 Stmt. ¶

107.

---

[9] The defendants filed a redacted copy of Mathen's employment agreement as Ex. Y to the Embry Declaration.
[10] Nambiar claims that in or around January 2016, she had noticed that COG's billing department was misrepresenting to insurers that she performed certain procedures in COG's offices, when in fact she performed them at Melville Surgery Center.  Pl. Rule 56.1 CounterStmt. ¶ 107.  She further claims that this misrepresentation allowed COG to bill more for those procedures than was proper.  *Id.*  The dispute concerning the placement of the staffer stems from the placement of a staff member named Stephani in Nambiar's office while the basement was being renovated.  Defs. Rule 56.1 Stmt. ¶ 111.  Nambiar contends there was other space in the office to move Stephanie during the renovations.  Pl. Rule 56.1 CounterStmt. ¶ 111.

### J.  Nambiar's Subsequent Employment

In June 2016, Nambiar began working at Orlin & Cohen as a pain management physician.  *Id.* ¶ 155.  She was fired on July 15, 2016.  *Id.* ¶ 156.  Orlin & Cohen claim that based on her colleagues' observations during the initial five weeks of her employment, there was "a preponderance of evidence supporting [Orlin & Cohen's] conclusion that the upfront representations of [her] qualifications, abilities, and expertise [were] wholly inconsistent with [her] performance and judgment." *Id.*  Nambiar claims that Orlin & Cohen never gave her an opportunity to learn the pain department processes for interventional procedures, like taking photographs for billing purposes.  Pl. Rule 56.1 CounterStmt. ¶ 156.  Nambiar challenged the termination.  Embry Del. Ex. XX.

In October 2016, Nambiar then applied for a position at Northwell Health.  Defs. Rule 56.1 Stmt. ¶ 158.  Nambiar initially received a letter of intent from Northwell but the letter was rescinded.  *Id.*  Although the parties dispute why the offer was withdrawn, it appears that the doctor interviewing her at Northwell had questioned why she had left her employment with Orlin & Stein off of her resume.  Pl. Rule 56.1 CounterStmt. ¶ 158.  In December 2016, Nambiar opened up her own practice in Commack, New York providing pain management and outpatient physical medicine rehabilitation.  Defs. Rule 56.1 Stmt. ¶ 159.  After leaving COG, Nambiar also started working at a medi spa called NO LINEZ Aesthetics & Laser, which her husband owns.  *Id.* ¶ 160.

### II.    Procedural History

Almost three years later, Nambiar commenced this action.  The defendants filed an answer on April 4, 2019.  On February 4, 2020, District Judge Feuerstein, who had been assigned to the case, entered an order requiring any party planning to make a dispositive motion

to serve moving papers no later than 30 days after the discovery deadline of April 30, 2020, which the defendants did.  By letter dated May 26, 2020, the parties then advised Judge Feuerstein that they had agreed to a briefing schedule.  Pursuant to the agreed upon schedule, on June 18, 2020, the defendants filed their motion for summary judgment and Nambiar filed a cross-motion seeking to strike numerous exhibits offered by the defendants arguing that the documented complaints about her were hearsay.

On June 3, 2021, with the motions *sub judice,* the case was reassigned to District Judge Brown.  Two weeks after the case was reassigned, Judge Brown deemed the respective motions withdrawn with leave to renew following a premotion conference before him.  That conference was scheduled for August 11, 2021.  In the order scheduling the conference, the parties were advised that in appropriate cases, the pre-motion letter and Rule 56.1 Statement as well as the response and Rule 56.1 Counterstatement, along with counsels' arguments at the pre-motion conference, could be construed, at the discretion of the Court, as the motion itself.  The conference was then adjourned to October after it was determined that Nambiar had failed to file a Rule 56.1 Counterstatement.

On October 27, 2021, Judge Brown held the premotion conference during which he granted the defendants' motion for summary judgment with respect to the retaliation claim.  Specifically, Judge Brown found that Nambiar had claimed that the defendants had retaliated against her due to the fact that she filed a claim with the EEOC but the only person she told about the filing was not a decision maker for the purposes of her hiring and firing.  ECF No. 52. In addition, during the conference, counsel for the plaintiff acknowledged that his client had no proof that the office manager who was allegedly informed of the EEOC complaint told anyone else in the office.

Moreover, although Judge Brown directed the parties to submit briefs addressing the sex and age discrimination claim as well as the state breach of contract claim, he did note that Nambiar was already in the alleged protected classes when she was hired.  In fact, the following colloquy took place:

> THE COURT: Your client was how old when she was hired?
>
> MR. DELLICARPINI: Well I believe she was in her 40s already when she was hired. Although she started working for them a few years before she actually signed an employment agreement. I believe she was in her 40s even at the earliest junction.
>
> THE COURT: Okay. So she was hired when she was already in the protected class. Fair?
>
> MR. DELLICARPINI: That's, yeah, I believe so.
>
> THE COURT: And she was fired within a few years, right, she was still in her early 40s I believe when she was fired, yes?
>
> MR. DELLICARPINI: Four, maybe five years into the hiring, yes, into her work.
>
> THE COURT: Okay, and she was replaced with someone who was 36, did I read that correctly?[11]
>
> MR. DELLICARPINI: Yes, a younger male physician.
>
> THE COURT: Okay. I know you want to tell me he's a younger male physician, but [] wasn't he sort of rounding third base in terms of entering the protected class himself at 36?
>
> *          *          *
>
> THE COURT: [She] was hired when she was already in the protected class. She's replaced by somebody who is pretty darn close. My question to you is, is this really an age discrimination case? I mean there's so much else going on here. Is this really an age discrimination case?

ECF No. 52.

---

[11] Lee applied for the position at COG when he was 37.  Defs. Rule 56.1 Stmt. ¶ 12.

Despite Judge Brown's comments, Nambiar decided to continue to pursue both the age and sex discrimination claim.  However, several weeks following the premotion conference, Judge Brown was advised by counsel for Nambiar that he had learned that a partner at his firm had peripherally represented Judge Brown in an insurance matter.  As a result, Judge Brown immediately recused himself out of an abundance of caution and the case was reassigned to District Judge Seybert.  Following the reassignment, on January 5, 2022, the defendants refiled the instant motion for summary judgment and Nambiar filed a motion for reconsideration of Judge Brown's ruling granting summary judgment on the retaliation claim as well as a motion to strike many of the defendants' exhibits.  The motions were referred to the undersigned for a report and recommendation on October 26, 2023.

## DISCUSSION

### I.  Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'"  *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 U.S. Dist. LEXIS 133281, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996).

26

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party may not rest upon conclusory allegations or denials but must set forth "concrete particulars" showing that a trial is needed.  *R.G. Grp., Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp*., 585 F.2d 31, 33 (2d Cir. 1978));  *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) ("there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim") (quoting *Celotex,* 477 U.S. at 322); *E.E.O.C. v. Mavis Discount Tire, Inc.,* 129 F. Supp. 3d 90, 102 (S.D.N.Y. 2015) ("the nonmoving party must 'set out specific facts showing a genuine issue for trial' using affidavits or otherwise, and cannot rely on the 'mere allegations or denials' contained in the pleadings).  A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

However, "[t]he Second Circuit has 'explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'" *Greenberg v. State Univ. Hosp.-Downstate Med.*

*Ctr*., No. 15 CV 2343 PKC VMS, 2019 U.S. Dist. LEXIS 167956, 2019 WL 4752018, at *13 (E.D.N.Y. Sept. 29, 2019)(citing *Thompson v. Kaufman's Bakery, Inc.,* No. 03-CV-340 (WMS), 2005 U.S. Dist. LEXIS 22431, 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005)). Nevertheless, "summary judgment remains appropriate in discrimination cases, as 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.'" *Singh v. New York State Dep't of Taxation & Fin*., 911 F. Supp. 2d 223, 233 (W.D.N.Y. 2012) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## II.   Nambiar's Age Discrimination Claim

The ADEA provides in relevant part that "[i]t shall be unlawful for an employer to . . . discharge any individual or to otherwise discriminate against any individual with respect to [his, her, their] compensation, terms, conditions, or privileges of employment, because of such individual's age." *Mattera v. JPMorgan Chase Corp*., 740 F. Supp. 2d 561, 570 (S.D.N.Y. 2010) (citing 29 U.S.C. § 623(a)(1)).  "The ADEA covers the class of individuals who are over the age of 40."  *Dressler v. New York City Dep't of Educ*., No. 10 CIV 3769 JPO, 2012 WL 1038600, at *5 (S.D.N.Y. Mar. 29, 2012) (citing 29 U.S.C. § 631(a)).  The evidentiary framework for proving age discrimination under the statute is the same as that for proving discrimination under Title VII and the NYHRL.  *Cappelli v. Jack Resnick & Sons, Inc*., 2016 WL 958642, at *7 (S.D.N.Y. Mar. 8, 2016); *see also Mikinberg v. Bemis Co*., 555 Fed. Appx. 34, 35 (2d Cir. 2014) ("we have assumed, without deciding, that the ADEA's 'but for' standard of causation also applies to age discrimination claims brought under the [NYHRL]); *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 106 (2d Cir. 2010)(addressing similarity between ADEA and Title VII).  As such, Nambiar's age discrimination claims under both the federal and state statutes must be

analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Id.* (The Supreme Court in *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009), did not reject the *McDonnell Douglas* burden-shifting framework all together; rather, it clarified the applicability of that framework by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA).

Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of discrimination in the manner described below. *See Patterson v. City of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, and the burden shifts back to the plaintiff to show that the employer's reason is pretextual and that it masks the employer's true discriminatory reason. *Id.* While intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

To establish a prima facie case of age discrimination, a plaintiff must show that: (1) she is over 40; (2) she was qualified for the job for which she applied; 3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of age discrimination. *Dressler.* 2012 WL 1038600, at *6 (citing *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 107 (2d Cir. 2010). In addition, to make out a prima facie case of age discrimination under the ADEA, the plaintiff has the heightened burden of showing "'by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse

employment action' and not just a contributing or motivating factor." *Green v. Town of E. Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski.,* 596 F.3d at 106 (2d Cir. 2010) (discussing the prima facie case in the context of age discrimination); *see also O'Connor v. Consol. Coin Caterers Corp*., 517 U.S. 308, 312-13, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996) (" [T]he prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . ..") (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977))). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in [age based] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to" the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted); *see also Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (same).

In this case, Nambiar has not and cannot meet the heightened burden of showing that her age was the 'but-for' cause of her termination from COG.  To begin with, as Judge Brown had noted, Nambiar's age discrimination claim is undermined by the fact that she was already a member of the protected class when the defendants hired her.  *See* Defs. Rule 56.1 Stmt. ¶ 9; Pl. Rule 56.1 CounterStmt. ¶ 9; *see also Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981) (finding no direct evidence of age discrimination when plaintiff was hired at the executive level when he was 51); *Snowden v. Trs. of Columbia Univ.,* 12 Civ. 3095 (GBD), 2014 WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), aff'd, 612 F. App'x 7 (2d Cir. 2015) ("Where, as here, an employee is already a member of the protected class when hired, any inference of age discrimination when her employment is terminated is undermined.").  In particular, Nambiar was

30

40 years old when she signed her employment agreement, 41 years old when she began working for COG and 43 years old when she was terminated.[12]  In addition, Lee, her alleged replacement, was not significantly younger. While the statutes would certainly protect a 43-year-old replaced by a 37-year-old if such 43-year-old was truly replaced because of her age, the evidence in cases such as this is thin.  *See O'Connor*, 517 U.S. at 313, 116 S. Ct. at 1310 (the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than a situation where, as here,  a plaintiff is replaced by a worker who is insignificantly younger).

In addition, Nambiar's age discrimination claim is weakened by the fact that she was fired by the same partnership that hired her when she was 40 and that several of the partners making those hiring decisions were, themselves, well within the protected class.  *Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir. 2000)("In the past, we have found this factor highly relevant, stating that 'some factors strongly suggest that invidious discrimination was unlikely.'").  Nambiar's allegations are further undercut by the fact that Lee was hired by COG with no potential for partnership.  Embry Decl. Ex. L 36:23-25.  While a comparator does not need to have an identical job, the marked difference in Nambiar's and Lee's payment structure and partnership potential nonetheless raises questions as to Lee's sufficiency as a potential comparator.  *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015).

Moreover, even if the Court were to entirely credit Nambiar's scant evidence of an alleged discriminatory intent - the advertisement that indicated COG wanted someone "eager,

---

[12] Nambiar argues that she was employed by COG before she turned 40.  However, the record is clear that between 2012 and April 2014, she chose to stay at HMG as a partner and was only working out of COG as an independent contractor pursuant to a Facilities Use Agreement.  Defs. Rule 56.1 Stmt. ¶¶ 36, 37.

young, and looking to work hard," the jokes made about Zitner's age,[13] Zitner's comment that COG was a young practice, and Silverman's comment that he had received resumes from very young physicians - the sum total of that evidence is insufficient to create an inference of age discrimination given the wealth of support offered by the defendants that there were legitimate and non-discriminatory reasons for her termination.  Indeed, the record is filled with examples of complaints that the defendants had received about Nambiar's attitude, conduct and behavior with patients and staff.  *See Baldwin v. North Shore Univ. Hosp*., 470 F. Supp. 2d 225, 232 (E.D.N.Y. 2007) (finding that patient complaints constituted valid non-discriminatory reasons for employer's conduct) (citing *Bogdan v. N.Y. City Transit Auth*., No. 02 Civ. 09587(GEL), 2005 WL 1161812, at *8, (S.D.N.Y. May 17, 2005) (multiple complaints of poor job performance as legitimate, non-retaliatory reasons for employee's termination)).  This is so, even if the patient and staff complaints were, as Nambiar argues, untrue or unjustified.  *Paul v. Lenox Hill Hosp.,* No. 13 CV 1566 CBA LB, 2016 WL 4775532, at *13 (E.D.N.Y. Jan. 15, 2016), report and recommendation adopted, No. 13-CV-1566 (CBA) (LB), 2016 WL 1271034 (E.D.N.Y. Mar. 29, 2016) (truth or falsity of the patient complaints themselves is immaterial).

In fact, Nambiar's own allegations support a finding that the reasons for her termination were nondiscriminatory.  Nambiar claims that Silverberg had indicated that COG's rationale for taking her off the partnership track was not based on the patient and staff complaints, but rather was financial.  Pl. Rule 56.1 CounterStmt. ¶ 91.  Specifically, she says the partners did not want to share their revenues with a pain management physician and did not believe that she would collect over $1 million.  *Id.*  Accordingly, the Court finds that Nambiar has failed to show that

---

[13] Nambiar alleges that at the December 2015 holiday party, Kerker commented about Zitner's retirement, saying, "it was his time to retire because he was too old and the young doctors needed to take over." Defs. Rule 56.1 Stmt. ¶ 135.  At her deposition, Nambiar admitted it was probably said in jest.  Embry Decl. Ex. F 73:18–25; 74:3–4; 230:10–12, 18–24.

the legitimate, non-discriminatory reasons for her termination advanced by the defendants were a pretext, and therefore, the undersigned recommends that the age discrimination claim be dismissed.

### III.    Nambiar's Sex Discrimination Claim

Nambiar has also failed to meet her threshold burden of establishing a prima facie case of sex discrimination.  Similar to the ADEA, Title VII prohibits employers from discriminating against an individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "'To establish a prima facie case of [sex] discrimination under Title VII, a plaintiff must show that '(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.'" *Mercedes v. AVA Pork Prod., Inc*., No. 13-CV-3212 (JFB) (AKT), 2014 U.S. Dist. LEXIS 48416, 2014 WL 1369611, at *5 (E.D.N.Y. Apr. 8, 2014) (citing *Chang v. N.Y.C. Dep't for the Aging,* No. 11 Civ. 7062(PAC) (JLC), 2012 U.S. Dist. LEXIS 50436, 2012 WL 1188427, at *4 (S.D.N.Y. Apr. 10, 2012).  In this context, "New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII, and thus, claims under the NYHRL and under Title VII are essentially identical." *Allen v. Advanced Digital Info. Corp*., 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007) (citing *Brown v. County of Oneida*, 41 F. Supp. 2d 172, 180 (N.D.N.Y. 1999)).

To satisfy the burden associated with the fourth element, that is, that she was terminated under circumstances giving rise to an inference of sex discrimination, Nambiar must demonstrate "that a similarly situated employee not in the relevant protected group received better treatment.'" *Smith v. New Venture Gear, Inc*., 320 Fed. Appx. 33, 35 (2d Cir. 2009) (quoting *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir. 2001)); *see also Kampmier v. Emeritus*

*Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (because plaintiff failed to identify a similarly situated individual whom her employer treated differently, district court properly granted employer's motion for summary judgment dismissing plaintiff's claim of discrimination).   As noted above, Nambiar has not identified any male pain management physicians that were treated differently or better by COG than the manner in which she was treated.   This is because Nambiar was the only pain management physician employed by COG during her tenure.  Defs. Rule 56.1 Stmt. ¶ 142.  Indeed, it is undisputed that Nambiar was the first pain management physician, male or female, to be placed on a potential partnership tract at COG.  *Id.* ¶ 143.

Moreover, to the extent that Nambiar seeks to compare the defendants' treatment of her to their treatment of her replacement, Lee, it is important to note that although Lee is male, he was never offered a partnership track job with COG.  Embry Decl. Ex. L 36:23-25; *see also Figueroa v. RSquared NY, Inc.*, 89 F. Supp. 3d 484, 492 (E.D.N.Y. 2015) (plaintiff failed to allege the existence of a similarly situated comparator as required to establish a prima facie case of disparate treatment sex discrimination in violation of Title VII and the NYSHRL).   In fact, even if the Court were to analyze the defendants' treatment of all of the defendants' employee physicians regardless of their subspecialties, Nambiar has not come forward with any evidence that would permit a plausible inference of sex discrimination.  While it is true that, during her tenure, all of the partners at COG happened to be male, COG had previously employed a female orthopedic surgeon as a partner.  *Id.* ¶ 142.  That partner voluntarily left to join another practice.  *Id.*  In addition, there is evidence that during the same time period, COG had fired a male physician, Dr. Mitchell Goldstein, due to patient and staff complaints.  Defs. Rule 56.1 Stmt. ¶ 141.

COG has also asked the Court to consider its treatment of a third physician, Dr. Santosh Mathen, a younger, male orthopedic surgeon hired during Nambiar's tenure, who was given a longer probationary period than the one initially offered to Nambiar. *Id.* ¶ 154. In addition, like it had with Nambiar, COG then changed Mathen's potential for a partnership track during the probationary period because he was having issues, among other things, with hospital staff. *Id.* In fact, like Nambiar, COG insisted that Mathen change the terms of his initial employment agreement to give him a year to "clean up his act." Embry Decl. Ex. Y. Unlike Nambiar, however, Mathen agreed to the new employment terms, allegedly changed his behavior, and was ultimately put back on the partnership track. Defs. Rule 56.1 Stmt. ¶ 154. Finally, COG interviewed and extended job offers to two other female surgeons, one during the term of Nambiar's employment and the other following her termination. *Id.* ¶¶ 146-47. While defendants could not, alone, escape liability for discrimination based on the fact that they treated male physicians in the same manner as they treated Nambiar or that they had offered several female positions jobs during the relevant time frame, the evidence can be considered to counter the inference Nambiar has asked this Court to make based on the fact that COG was a "male-dominated" practice. *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).

What's more, as previously stated in connection with the age discrimination claim, there is ample evidence to support the defendants' contention that their decision to terminate Nambiar was motivated by legitimate nondiscriminatory reasons, *i.e.,* the patient and staff complaints. *See Szewczyk v. City of New York*, No. 15-CV-918 (MKB), 2021 WL 2010504, at *7 (E.D.N.Y. Feb. 23, 2021), aff'd sub nom. Szewczyk v. Saakian, No. 21-672, 2022 WL 2037196 (2d Cir. June 7, 2022). As with the age discrimination claim, nothing in the record suggests that the reasons offered by the defendants for her termination were a pretext for sex discrimination . "A

plaintiff may show pretext 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action." Nambiar has not done so.  At best, Nambiar argues that none of the initial complaints by staff (pre-2015) were documented.  Pl.'s Mem. at 7.  She also takes issue with the fact that the complaints are based on the recollection, in large part, of the practice manager DeDomenico.  *Id*. She further characterizes the onslaught of complaints received by COG after 2015 as" minimal" and claims they can be contradicted.  *Id.*  Last, she argues that the fact that she did not have any malpractice actions pending against her as compared to those pending against the COG partners "shows a clear attempt: "to make her life as miserable as possible." *Id.* 7-8.  The undersigned disagrees and finds Nambiar's overall conclusory claim that the defendants "contrived" the onslaught of patient and staff complaints in order to fire her, to be unsupported by the record.

Finally, the Court rejects Nambiar's suggestion that the defendants' comments about her, alone, support an inference of sex discrimination.  To this end, Nambiar argues that a discriminatory intent can be read into the fact that they invited her husband to the February 2016 meeting so they could discuss the proposed amended employment agreement "more rationally." While Nambiar suggests that the invitation reflects the defendants' viewpoint that men are more reasonable then women, the fact remains that Nambiar's husband owned a medi spa and there had been some indication that Nambiar's husband had reviewed her past employment agreements, albeit, along with the couple's attorney.  Defs. Rule 56.1 Stmt. ¶ 82; Pl. Rule 56.1 CounterStmt. ¶ 9.  Nambiar also suggest that the defendants use of the term "married" to describe the partnership of the doctors (as in "not wanting to get married" to her), their reference to other nonphysician employees as "girls," and their suggestion that she be "sweeter" to staff and patients was sexist.  Again, when the record is viewed as a whole, the scant comments do

little to suggest that the business reasons offered by the defendants for her termination were a pretext. *See Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016) (("At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."). Accordingly, the Court finds that Nambiar has failed to present evidence sufficient to establish a prima facie case of sex discrimination or to convince a reasonable jury that COG's legitimate non-discriminatory reason for terminating her was a pretext. Thus, the undersigned respectfully recommends that the sex discrimination claim also be dismissed.[14]

## IV. Nambiar's Retaliation Claim

Nambiar also seeks reconsideration of District Judge Brown's October 27, 2021 decision granting the defendants' motion for summary judgment with respect to her retaliation claim. As a threshold matter, the Court finds that the motion is untimely. The deadline that applies to the instant motion for reconsideration is governed by Local Civil Rule 6.3. *Harris v. City of New York*, No. 23-CV-6344 (VSB), 2023 WL 7474419, at *1 (S.D.N.Y. Oct. 12, 2023). Local Civil Rule 6.3 provides that a motion for reconsideration "shall be served within fourteen (14) days after the entry of the Court's determination of the original motion." *Id.* As the defendants correctly note, Nambiar had until November 10, 2021 to move for reconsideration but did not serve the defendants until December 22, 2021.

In addition, "[t]he standard for a motion for reconsideration 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the

---

[14] The Court need not address the parties' argument concerning punitive damages given its findings.

conclusion reached by the court.'" *Id*. (citing *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995)); *see also L.I. Head Start Child Development Services, Inc. v. Kearse*, 96 F. Supp. 2d 209, 211 (E.D.N.Y. 2000) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); *see Medoy v. Warnaco Employees Long Term Disability Ins. Plan*, No. 97 Civ. 6612 (SJ), 2006 U.S. Dist. LEXIS 7635, 2006 WL 355137 (E.D.N.Y. Feb. 14, 2006). "Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce resources*." Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (internal citations and quotations marks omitted).  Indeed, "[t]he major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. National Mediation Bd*., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790)).  Those grounds do not exist in this case.

In order to establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Bhatti v. Physicians Affiliate Grp. of New York, P.C*., No. 18CV03139DLISJB, 2021 WL 4078506, at *7 (E.D.N.Y. Sept. 7, 2021), aff'd *sub nom. Bhatti v. Physician Affiliate Grp. of New York, P.C.,* No. 21-2522, 2022 WL 17543533 (2d Cir. Dec. 9, 2022).  While the plaintiff's burden at this first step is *de minimis*, the court must nonetheless determine whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.  *Id.* (quoting *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir. 2005)).

District Judge Brown analyzed Nambiar's proffer and concluded, at the pre-motion conference, that Nambiar was unable to satisfy the second element - that the COG partners were aware that she filed a complaint with the EEOC before they terminated her employment.  ECF No. 52.  Specifically, Judge Brown noted that while Nambiar alleges that she had advised COG's practice manager of her EEOC complaint, there was no evidence that any of COG's partners were aware of the EEOC complaint when the decision was made to terminate her.  *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) ("there [was] no indication that [the Assistant Superintendent] even knew about the right-to-sue letter when she proposed transferring respondent"); *Edwards v. Jericho Union Free Sch. Dist.*, 55 F. Supp. 3d 458, 468 (E.D.N.Y. 2014) (dismissing retaliation claim where there was no evidence that the union representatives brought plaintiff's discrimination complaints to the attention of anyone in the District).  The evidence offered by Nambiar in support of this claim has not substantially changed.  Nor has there been a change in controlling law.  For these reasons, the undersigned recommends that Nambiar's motion for reconsideration be denied.

## V.    Nambiar's Aiding and Abetting Claim

In her complaint, Nambiar also asserts a cause of action for aiding and abetting discrimination and retaliation as against Zitner, Silverberg, Baez, Keschner, Kerker and Checo. Given the Court's determination with respect to the discrimination and retaliation claims, the undersigned respectfully recommends that the aiding and abetting claim be dismissed.  *See Tate v. Rocketball, Ltd.,* 45 F. Supp. 3d 268, 273 (E.D.N.Y. 2014) (citing *Daniels v. Wesley Gardens Corp.*, 10–CV–6336T, 2011 WL 1598962, at *4 (W.D.N.Y. Apr. 27, 2011) (holding that dismissal of the aiding and abetting violations of NYSHRL is appropriate where the principal cause of action was dismissed on the merits)); *C.f. McHenry v. Fox News Network, LLC*, 510 F.

39

Supp. 3d 51, 75 (S.D.N.Y. 2020)(because complaint stated viable principal claims of retaliation against corporate defendant under the NYSHRL, it supplied a basis for aiding and abetting claims against individual, whose actual and intentional participation in conduct was well pled).

**VI.     Nambiar's Breach of Contract**

Lastly, the undersigned recommends that the Court refrain from exercising pendent jurisdiction over Nambiar's state breach of contract claim.  *See Kavit v. A. L. Stamm & Co*., 491 F.2d 1176, 1180 (2d Cir. 1974).  "A federal court may decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *K.W. ex rel. Brown v. City of New York*, 275 F.R.D. 393, 400 (E.D.N.Y. 2011) (citing 28 U.S.C. 1367(c)); *Daniel v. Safir,* 135 F. Supp. 2d 367, 377 (E.D.N.Y. 2001) (a refusal to hear pendent claims may be justified, even if the federal and state claims are related, where . . . the "court has dismissed all claims over which it had original jurisdiction.")(internal citations omissions).

Nambiar's breach of contract claim is centered around the parties' dispute as to the effective date of Nambiar's employment agreement.  Nambiar claims the defendants breached the employment agreement by terminating her employment, at will, on 90-day notice, after the start of her third term of employment.  She bases this claim on the fact that she signed the agreement in November 2013.  The defendants contend that the agreement runs from her actual start date and not the date she signed the agreement.  They argue that although the effective date of the contract was left blank in the agreement, the contract refers, in a separate paragraph, to the

actual start date of her working for COG.  They contend, therefore, that she was properly terminated during the two year probationary period.  While the breach of contract claim loosely derives from a common nucleus of facts, the state law claim does not focus on Nambiar's conduct at COG but rather on the parties' intent when they entered into the agreement, which is governed entirely by state law.  Indeed, a resolution of this claim will involve a detailed analysis as to whether the contract language is ambiguous and, if so, whether any ambiguity can, nonetheless, be resolved as a matter of law.  In sum, notwithstanding the substantial amount of litigating already done before this Court, the state law issue is the real body of this case and should be decided in the state court.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc.*, No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants*

*Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated: Central Islip, New York
        February 1, 2024

                                    _____/s_____
                                    ARLENE R. LINDSAY
                                    United States Magistrate Judge